## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YS GM MARFIN II LLC; YS GM MF VI LLC; YS GM MF VII LLC; YS GM MF VIII LLC; YS GM MF IX LLC; YS GM MF X LLC, YIELDSTREET MARINE FINANCE, LLC, AND YIELDSTREET MANAGEMENT, LLC, | |
| *Plaintiffs*, | CIVIL ACTION NO.: 20-cv-3320 |
| v. | |
| FOUR WOOD CAPITAL ADVISORS, LLC, AND FOUR WOOD CAPITAL PARTNERS, LLC, | **COMPLAINT** |
| *Defendants*. | |

Plaintiffs YS GM MARFIN II LLC, YS GM MF VI LLC, YS GM MF VII LLC, YS GM MF VIII LLC, YS GM MF IX LLC, YS GM MF X LLC (collectively, "Lenders"), YieldStreet Management, LLC ("YS Management"), and YieldStreet Marine Finance, LLC ("YS Marine") (YS Management and YS Marine collectively, "YieldStreet") file this complaint against Four Wood Capital Advisors, LLC ("FWCA") and Four Wood Capital Partners, LLC ("FWCP") (collectively, "Manager" or "Defendants") and allege as follows:

## I.

## NATURE OF THE ACTION

1.     Plaintiffs are parties to and beneficiaries of an Investment Management Agreement dated April 18, 2018 with Defendants ("Agreement"). Pursuant to the Agreement, Defendants recommended that Plaintiffs engage in specialty financing transactions whereby Lenders originally loaned over $89.2 million to Dubai-based companies, among others, that borrowed the funds to acquire end-of-life vessels for the purpose of resale and deconstruction (e.g., recycling of the metal). Those companies have since defaulted on the loans and concealed, sold and deconstructed the vessels that constitute Lenders' collateral – notwithstanding Defendants' obligations to track, monitor, and secure that collateral on behalf of Plaintiffs.

2.     Specifically, the Agreement required that Defendants manage and service the loans, monitor the borrowers' performance of the underlying loan agreements, monitor and track the locations of the vessels that served as secured collateral for the loans, and manage the borrowers' repayment of the loans. Even apart from the Agreement, Defendants assumed fiduciary duties to Plaintiffs, including the duty of care and duty of candor.

3.     After the loans were originated and financed, however, Defendants failed to satisfy their fiduciary and contractual duties. Defendants failed to use reasonable care in ensuring the

borrowers' compliance and monitoring the collateral vessels. Without Plaintiffs' knowledge or consent, the borrowers sold vessels that Defendants were required to ensure the security of as collateral for the loans. Defendants failed their core obligation to monitor and safeguard the collateral – they literally lost track of many vessels, some larger than three football fields. Defendants then failed to search for, or even disclose, the lost collateral in a timely manner. As a result, Lenders have not received payment of the principal nor the interest owed on the loans that were extended to finance the purchase of those vessels.

4.      Plaintiffs have engaged in extensive efforts to recover Lenders' investment from the borrowers in multiple jurisdictions. On April 2, 2020, and again on April 22, 2020, The High Court of Justice of England and Wales entered Orders imposing a Worldwide Freezing Injunction against the guarantors and the disposition of property, wherever it may be found, valued at $76,700,000 (the latter Order attached hereto as Exhibit A). By Warrant of Arrest dated March 17, 2020, The High Court of Malaya at Kuala Lumpur, ordered the seizure of one of the vessels pledged as collateral for the defaulted loans. The ongoing, extraordinary effort to recover from the borrowers would have been completely unnecessary had Defendants discharged their fiduciary and contractual duties, or even if Defendants had disclosed their failure to do so in enough time for Plaintiffs to minimize losses.

5.      Plaintiffs seek damages due to Defendants' breach of the Agreement, breach of fiduciary duties, misrepresentation and negligence. To date, those damages exceed $87 million in compensatory damages alone, with still additional damages resulting from the great expense of the ongoing international recovery effort, and the substantial fees charged by Defendants as managers of these loans and as trusted fiduciaries of Plaintiffs.

## II.

## THE PARTIES

6.      Plaintiff YS GM MARFIN II LLC is an entity organized under the laws of the State of Delaware with its principal place of business located at 300 Park Ave, New York, NY 10022, and is a wholly-owned subsidiary of YS ALTNOTES I, LLC.

7.      Plaintiff YS GM MF VI LLC is an entity organized under the laws of the State of Delaware with its principal place of business located at 300 Park Ave, New York, NY 10022, and is a wholly-owned subsidiary of YS ALTNOTES I, LLC.

8.      Plaintiff YS GM MF VII LLC is an entity organizes under the laws of the State of Delaware with its principal place of business located at 300 Park Ave, New York, NY 10022, and is a wholly-owned subsidiary of YS ALTNOTES I, LLC.

9.      Plaintiff YS GM MF VIII LLC is an entity organized under the laws of the State of Delaware with its principal place of business located at 300 Park Ave, New York, NY 10022, and is a wholly-owned subsidiary of YS ALTNOTES II, LLC.

10.      Plaintiff YS GM MF IX LLC is an entity organized under the laws of the State of Delaware with its principal place of business located at 300 Park Ave, New York, NY 10022, and is a wholly-owned subsidiary of YS ALTNOTES II, LLC.

11.      Plaintiff YS GM MF X LLC is an entity organized under the laws of the State of Delaware with its principal place of business located at 300 Park Ave, New York, NY 10022, and is a wholly-owned subsidiary of YS ALTNOTES I, LLC.

12.      Plaintiff YS Marine is an entity organized under the laws of the State of Delaware with its principal place of business located at 300 Park Ave, New York, NY 10022.

13.     Plaintiff YS Management is an entity organized under the laws of the State of Delaware with its principal place of business located at 300 Park Ave, New York, NY 10022.

14.     Defendant FWCP is a private equity fund manager organized under the laws of the State of New York with its principal place of business located at 100 Wall Street, 11th Floor, New York, NY 10005.

15.     Defendant FWCA is a financial advisory firm and investment adviser. FWCA is an entity organized under the laws of the State of New York with its principal place of business located at 100 Wall Street, 11th Floor, New York, NY 10005.

**III.**

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction over this case pursuant to Article III of the U.S. Constitution and 28 U.S.C. § 1333. Federal district courts have original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, . . . ." 28 U.S.C. § 1333(1). The Agreement at issue in this case is a maritime contract. The principal objective of the Agreement relates to maritime commerce, specifically the origination and financing of vessels to be acquired overseas, transported on navigable and international waterways, and ultimately sold for vessel deconstruction. This Court has subject matter jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are so related to claims falling under this Court's original jurisdiction that they form part of the same case or controversy.

17.     The parties themselves have contractually agreed that both jurisdiction and venue are proper in this District.  The Agreement provided that "[i]n the event of any judicial proceeding involving any dispute, controversy or claim arising out of or relating to this Agreement, each of the parties hereto irrevocably and unconditionally agrees (i) to be subject to the exclusive jurisdiction of the courts of the State of New York and of the United States District Court for the

Southern District of New York, and any courts appealable from any such court" for the dispute, such as this one, arising out of or relating to this Agreement.

18.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because parties reside in this district at the addresses listed in the section above. Venue is further appropriate for the same reasons that this Court has jurisdiction over the Defendants. A substantial amount of the events complained of occurred in this district, and Defendants carry on a continuous and systematic part of its business in the State of New York, including through their principal place of business in Manhattan.

## IV.

## FACTUAL ALLEGATIONS

### A.  The Management Agreement

19.     In April 2018, YS Marine signed the Agreement with Defendants. Each of the Lenders subsequently signed a Joinder to the Agreement in addition to a Schedule B-1 of the Agreement which were specifically incorporated by reference into the Agreement.

20.     As specified in the second paragraph of the Agreement, Defendants were engaged "to provide investment management services with respect to ship finance transactions, loans or leases sourced and managed by the Manager . . . ."

21.     Defendants were required to originate, facilitate, monitor and manage alternative investments that target high-yield returns in specialty lending to overseas marine finance companies. Pursuant to the Agreement, Defendants were to "source prospective transactions from qualified owner/operators of middle market shipping companies."

22.     Importantly, the Agreement also required that "Manager will monitor loan repayments, the underlying security and the compliance of the documented terms and covenants by the borrowers, taking action as (or if) directed by the [Lenders] in the event of a breach of the

agreed terms by the borrower." In the case of vessel-backed maritime loans, Defendants'
obligations for "monitoring" the underlying security required them to keep track of the location of
the vessels, among many other obligations.

23.     Each Schedule B-1 signed between Defendants and Lenders specifically stated that:
"Manager shall seek to source opportunities for the [Lenders] to lend capital to shipping companies
that meet the **Schedule A** Investment Guidelines in the Agreement." These supplements executed
under Schedule B-1 were specifically incorporated into the Agreement.

24.     Defendants were also to use reasonable care and reasonable commercial judgment
in performing their duties under the Agreement. Specifically, the Agreement required that
"Manager shall use its reasonable commercial judgment in accordance with reasonable industry
standards" in discharging their contractual duties.  Furthermore, "Manager shall monitor, collect,
administer and service each loan with reasonable care using the degree of skill and attention that
is (i) deemed commercially reasonable in the industry, and (ii) no less than the degree of skill and
attention it uses in servicing and administering similar loans for its own accounts, accounts for its
affiliates, or for the account of other investors and in all cases in accordance with applicable laws."

25.     Defendants also had a duty to promptly notify Plaintiffs of material adverse events
relating to the Loans. Specifically, "Manager shall promptly, but in no event later than two (2)
days after receipt of notice thereof or actual knowledge of an occurrence, as applicable, provide
[Plaintiffs] with: (i) . . . (ii) notice of the occurrence of an 'Event of Default' (as such term is
defined in each loan agreement); (iii) notice of any event or condition [that] could be reasonably
likely to have a material adverse effect on the ability of the borrower to repay the loan by the
maturity date then in effect; and (iv) any other material notices, reporting or documents received
by Manager in connection with the loans." Similarly, pursuant to paragraph (c) in Exhibit B to the

Agreement, Defendants were obligated provide "prompt notice of a breach, amendment, waiver or termination by any party to the Underlying Document and any other material event or occurrence relating" to the Loans.

26.     The Agreement provides that it was "to be governed by and interpreted in accordance with the laws of the State of New York without giving effect to the principles of conflicts of laws."

27.     Paragraph (i) of Exhibit B to the Agreement provides: "In any litigation, arbitration or other proceeding by which one party either seeks to enforce its rights or obligations under this Agreement (whether in contract, tort, or both) or seeks a declaration of any rights or obligations under this Agreement, the prevailing party shall be awarded its reasonable attorney fees, and costs and expenses incurred."

28.     Throughout the relevant time period, Defendants conducted business in the name of their affiliate Global Marine Transport Capital, LLC ("GMTC"). GMTC has offices in New York and Greece and is a subsidiary of FWCP formed to perform services relating to the global shipping industry. While the Agreement permitted Defendants to delegate some of its duties to GMTC, Defendants remained responsible for their duties under the Agreement.

29.     Defendants charged more than $3 million for services purportedly provided under the Agreement.

**B.  The Loans**

30.     Between June 2018 and September 2019, Lenders extended six loan facilities in the total amount of approximately $89.2 million ("**Loans**") to fifteen (15) companies sourced by Defendants: Gemini Marine Ltd., Gemini Marine (No. 1) Ltd., Gemini Marine (No. 2) Ltd., Gemini Marine (No. 3) Ltd., Gemini Marine (No. 4) Ltd., Gemini Marine (No. 5) Ltd., Gemini Marine (No. 6) Ltd., Gemini Marine (No. 7) Ltd., Gemini Marine (No. 8) Ltd., Gemini Marine

(No. 10) Ltd., Gemini Marine (No. 12), Ltd., Gemini Marine (No. 13) Ltd., Gemini Marine (No. 14) Ltd., Aquarius Marine Ltd., and North Star Marine Ltd. (collectively, "North Star Borrowers").[1]

31.     North Star Borrowers are wholly-owned subsidiaries of North Star Maritime Holdings Limited ("North Star"), an entity incorporated under the laws of St. Kitts-Nevis. North Star is owned equally between Muhammad Ali Lakhani and Muhammad Hasan Lakhani, sons of Muhammad Tahir Lakhani, the former Chairman of the United Arab Emirates Shipping Association, and they are the ultimate owners of North Star Borrowers (collectively, "Lakhanis"). North Star provided corporate guarantees and the Lakhanis provided personal guarantees as additional security for Loans made to North Star Borrowers.

32.     These Loans were extended to North Star Borrowers for financing vessel deconstructions.[2] North Star Borrowers sought loans in order to on-sell these vessels to third-parties for deconstruction. The deconstruction proceeds were then to be paid to the Lenders under the loan agreements.

33.     On or around June 1, 2018, YS GM MarFin II LLC made a loan facility of $25,000,000. The loan was subsequently amended in late 2018 to increase the total loan amount of $37,500,000. The purpose of the facility was to finance acquisition of vessels slated for deconstruction, as described above.

34.     On or around March 22, 2019, YS GM MF VIII LLC made a loan of $16,050,000 to Gemini Marine (No. 6) Ltd. for the purchase of the vessel "Wu Xian".

---

[1] One loan in the principal amount of approximately $9 million was repaid on or around July 3, 2019.

[2] To summarize the vessel deconstruction business, when vessels approach the end of their useful economic life, their owners will often sell the vessels to short-term buyers who, in turn, sell those vessels to recyclers/scrappers for deconstruction into component parts and commoditized metal.

35.    On or around March 31, 2019, YS GM MF VII LLC made a loan of $12,650,000 to Gemini Marine (No. 7) Ltd. and Gemini Marine (No. 8) Ltd., for the purchase of three vessels, namely the "Geneva", "Ana" and "Ron." The loan was subsequently amended to include Gemini Marine (No. 10) Ltd. as an additional borrower.

36.    On or around May 29, 2019, YS GM MF IX LLC made a loan of $9 million to Gemini Marine (No. 12) Ltd. and Gemini Marine (No. 13) Ltd., for the purchase of two vessels, namely the "Ari" and "Spirit."

37.    On or around September 11, 2019, YS GM MF X LLC made a loan of $14,500,000 to Gemini Marine (No. 14) Ltd. for the purchase of the vessel "Atban."

38.    Pursuant to the underlying loan agreements, certain amounts were to be repaid by the earlier of 180 days after the funds were advanced or the date vessels were delivered to the scrappers. In every event, the Loans were to be repaid by the termination dates set forth in the applicable agreement.

39.    The Loans were secured by collateral, which included first priority ship mortgages on each of the vessels financed by the Loans, corporate guarantees, personal guarantees, assignments of sales proceeds and/or insurance proceeds. North Star and the Lakhanis also served as guarantors for the Loans.

**C.  Borrowers Defaulted on the Loans**

40.    North Star Borrowers became late in paying amounts due under certain Loans and Defendants began advocating for extensions of the maturities on some of these facilities, based on explanations for the late payments that Defendants assured were appropriate when, in fact, they were pretextual.

41.    Specifically, the North Star Borrowers' failure to meet their payment obligations was attributed to a handful of – what appear in retrospect to have been pretextual – reasons,

including that the scrappers were unable to take delivery of the vessels because of a cyclone near India, and that expected payments were impeded by restrictions on international monetary transfers and issuances of letters of credit. Although the identified circumstances may themselves have been real (extreme weather, for example, did lead to some commercial and industry delays), Defendants failed to disclose that these were *not* the actual reasons why the North Star Borrowers were not repaying the Loans. To the contrary, Defendants repeatedly credited those explanations.

42.     Defendants failed to manage the Loans to minimize the risk that Borrowers would fail to comply with the new maturity extensions and did not disclose to Plaintiffs that Defendants could not even locate the collateral that secured those Loans. North Star Borrowers again failed to make the payments by the extended payment dates.

43.     In March 2020, Plaintiffs exercised their contractual rights to terminate and accelerate the Loans, requiring the immediate payment of the remaining principal and default interest. As of March 31, 2020, a total of approximately $76.7 million is in default across the five North Star Loans. As of the filing of this Complaint, North Star Borrowers have not paid any of that amount to Plaintiffs.

### D. Defendants Violated the Agreement and their Fiduciary Duties After Loans were Originated and Financed

44.     Defendants held themselves out as a "one stop shop" with unique, highly-specialized knowledge regarding the highly specialized and insular overseas market for vessel deconstruction lending. Defendants proposed to find qualified borrowers and originate the loans that would form the basis of securities to be sold to sophisticated, accredited investors. Thereafter, Defendants were to manage, monitor and service the loans and North Star Borrowers' compliance with their underlying loan agreements. After the loans were originated and distributed, Defendants failed to comply with their fiduciary and contractual duties owed to Plaintiffs.

45.     Among their many derelictions of duty, Defendants failed to exercise reasonable care – and thus also fell well short of their still higher fiduciary duty of care – when it came to securing and safeguarding Lenders' interest in the vessels as creditors. They failed to secure and track the vessels and failed to ensure that other professionals they supervised did so in an effective manner and free of conflicts.

46.     Defendants failed to exercise reasonable care in recommending, retaining and directly supervising what they portrayed as a leading, multinational law firm on Lenders' behalf to document key loan safeguards to protect Plaintiffs' interests, including the drafting of underlying loan agreements, making sound recommendations on which flag states to use when registering Lenders' mortgages as a primary means to protecting Lenders' security, and ultimately registering ship mortgages to secure those interests on behalf of Lenders and Plaintiffs.

47.     Defendants also never disclosed that the law firm they recommended to represent Plaintiffs (and that Defendants thereafter supervised) had a longstanding and substantial business relationship with the Lakhanis (the ultimate owners of the North Star Borrowers). Had Plaintiffs known these facts, Plaintiffs would not have hired that firm. Plaintiffs were therefore shocked to receive notification in late February 2020 that the law firm recommended and supervised by Defendants since 2018 had stepped away from its representation of Plaintiffs. That law firm refused to serve Lenders' notices of default and acceleration on the North Star Borrowers because the firm would not take public action adverse or provocative to the Lakhanis.

48.     As Manager, Defendants also allowed critical mortgages and related documents securing the loans to be recorded in foreign flag jurisdictions that Defendants knew (or should have known) were understood as not confidently protective of creditors' rights. Defendants never informed Plaintiffs of the commercial creditor risks to their collateral interests in these foreign

jurisdictions. Nor did, to Plaintiffs' knowledge, Defendants do anything to mitigate that undisclosed risk with certain flag registries, or require the North Star Borrowers to flag the vessels in more protective flag registries for deconstruction transactions.

49.     When North Star Borrowers failed to pay in accordance with the Loans, Plaintiffs requested specific information, including the location of the vessels which Defendants were obligated to track.  Defendants and North Star Borrowers failed to provide that critical information. Despite Defendants' fiduciary and contractual duties to monitor and inform Plaintiffs of the status of the Loans, Defendants lost track of the vessels that were the collateral for the Loans.

50.     Defendants failed to use reasonable care in monitoring the Loans and the collateral, despite assurances that the vessels were secured. During Defendants' tenure as manager, they represented to Plaintiffs that they were in "constant dialogue" with Borrowers. These assurances turned out to be false. Vessels were in fact beached on the coast of Bangladesh. At least twelve (12) vessels financed by and secured as collateral for the Loans were sold and/or deconstructed overseas in countries such as Pakistan and India. Defendants also failed to disclose that four (4) other vessels had previously been seized by different lenders who may have their own interests in the vessels.

51.     Defendants also failed to manage a loan extended in March 2019 for the refinancing of a vessel later renamed the Wu Xian. The underlying loan agreement required the vessel to ultimately be sold to a buyer in Hong Kong with delivery in September 2019, and to repay the loan using the proceeds from that sale. The vessel was sold without Plaintiffs' knowledge or consent and the proceeds were instead diverted to other entities. Defendants failed to monitor Borrowers' compliance with these requirements and failed to take action upon this misappropriation. Plaintiffs

are currently engaged in proceedings before the Malaysian High Court (admiralty division) after Plaintiffs secured the arrest of the vessel. The loan remains in default.

52.     Defendants also failed to disclose to Plaintiffs that North Star had been voluntarily dissolved by its shareholders, i.e. the Lakhanis, and trustees were appointed to liquidate the company. Pursuant to the underlying loan agreements, both events constitute "Events of Default" that suffice for acceleration of the Loans. Furthermore, Defendants did nothing to prevent the proceeds from the sales of the vessels to be distributed by North Star to other entities in violation of Plaintiffs' rights and interests in the vessels and the Loans.

53.     Despite their requirements in the Agreement, Defendants failed to properly monitor the loans, Defendants failed to ensure North Star Borrowers' compliance with the underlying loan agreements, and Defendants failed to provide material information regarding the loans to Plaintiffs.

54.     Plaintiffs have since engaged in an aggressive, multi-jurisdictional effort to recover their investments. Plaintiffs have arrested one vessel through proceedings in a Malaysian court which was on its way to be sold without Plaintiffs' consent. Furthermore, Plaintiffs have obtained a worldwide freezing order through a proceeding in the United Kingdom against the Lakhanis.

55.     In connection with these recovery efforts, Plaintiffs repeatedly requested that Defendants provide information and documents concerning what Defendants did and did not do in discharge of their duties. Defendants have provided some information, but upon information and belief, additional information has not been provided notwithstanding Defendants' ongoing obligations.

56.     On April 27, 2020, Plaintiffs terminated the Agreement for cause.

## V.

## COUNT 1: Breach of Contract

57.     Plaintiffs repeat and incorporate each and every allegation set forth above as if fully set forth herein.

58.     YS Marine signed the Agreement with Defendants dated April 18, 2018. Each Lender signed a Joinder that was specifically incorporated by reference into the Agreement. Plaintiffs have complied with their material contractual obligations.

59.     The Agreement required, among other things, that Defendants "provide to YieldStreet prompt notice of a breach, amendment, waiver or termination by any party to the Underlying Document and any other material event or occurrence relating to the Opportunities."

60.     The Agreement further required that Defendants "shall monitor, collect, administer and service each loan with reasonable care using the degree of skill and attention that is (i) deemed commercially reasonable  in the industry, and (ii) no less than the degree of skill and attention it uses in servicing and administering similar loans for its own accounts, accounts for its affiliates, or for the account of other investors and in all cases in accordance with applicable laws."

61.     Defendants breached the Agreement, including but not limited to failure to use reasonable care in monitoring the loans, repayments and the secured collateral. Defendants did not use "reasonable care" nor the "degree of skill and attention that is deemed commercially reasonable in the industry." Defendants lost track of nearly all vessels financed by and used as collateral for the loans.

62.     Due to Defendants' breaches of the Agreement, Plaintiffs sustained damages, including but not limited to the loss of Plaintiffs' principal investment in the loans and loss of their secured mortgage interests in the vessels.

## COUNT 2: Breach of Fiduciary Duty

63.     Plaintiffs repeat and incorporate each and every allegation set forth above as if fully set forth herein.

64.     Defendants (as Plaintiffs' agent and adviser) owe Plaintiffs fiduciary duties, including the duty of candor and the duty of care.

65.     Defendants breached those fiduciary duties, including but not limited to that Defendants failed to properly ensure the security for the loans. For example, Defendants engaged a law firm on Plaintiffs' behalf that may have significant commercial conflicts and recorded mortgages and related documents in jurisdictions that would not properly protect Plaintiffs' secured interests.

66.     Furthermore, Defendants failed to provide Plaintiffs with timely and accurate information. Defendants did not notify Plaintiffs that North Star was in bankruptcy proceedings, even though this would materially affect the payments on Plaintiffs' investments, nor did Defendants inform Plaintiffs of the potential commercial issues with securing Plaintiffs' mortgage interests in jurisdictions that were unfriendly to creditors. Defendants similarly fell short of their fiduciary obligations with respect to other loans.

67.     Defendants also advised Plaintiffs to grant extensions to North Star Borrowers' payment due dates. Defendants' advice allowed North Star Borrowers to continue selling the vessels, transfer the proceeds out of North Star, and voluntarily liquidate North Star, rendering Plaintiffs' security interests essentially null and void.

68.     Due to Defendants' breach of those fiduciary duties, Plaintiffs suffered damages. These damages include, but are not limited to, the loss of the principal invested in the loans and interference in Plaintiffs' rights and interests in the vessels as collateral for the loans.

## COUNT 3: Negligent Misrepresentation

69.     Plaintiffs repeat and incorporate each and every allegation set forth above as if fully set forth herein.

70.     Defendants owe fiduciary duties to Plaintiffs, including the duty of candor to provide Plaintiffs with accurate and timely information relating to the loans. Apart from those fiduciary obligations, Defendants were obligated to perform their professional duties competently, and to provide honest and complete information to Plaintiffs.

71.     Defendants failed to provide Plaintiffs with correct and accurate information regarding the borrowers, the loans and their repayment. For example, Defendants advised Plaintiffs to grant extensions to the borrowers' interest and principal payment due dates. Defendants did this either with the knowledge that North Star Borrowers had violated the underlying loan agreements (if Defendants were properly monitoring the Loans) or without any knowledge of North Star Borrowers' compliance (if Defendants failed to monitor the Loans).

72.     During Defendants' tenure as manager they falsely represented to Plaintiffs that they were in "constant dialogue" with Borrowers. Defendants similarly misrepresented and omitted the true facts concerning the other loans. Defendants misrepresented and omitted the benefits of hiring the law firm they recommended, including a striking failure to disclose the law firm's substantial relationship with the borrowers.

73.     Plaintiffs reasonably relied on the information provided by Defendants. Defendants held themselves out as having unique and specialized knowledge in originating, facilitating, and monitoring marine finance loans. Defendants negotiated and oversaw the Loans on behalf of Plaintiffs. After the Loans were originated, Defendants were required to monitor the Loans and North Star Borrowers' compliance therewith.

74.     Due to Defendants' negligent misrepresentations, Plaintiffs suffered damages. These damages include, but are not limited to, the loss of the principal invested in the Loans and the loss of their interests in the collateral.

## COUNT 4: Negligence

75.     Plaintiffs repeat and incorporate each and every allegation set forth above as if fully set forth herein.

76.     Defendants owe a duty to exercise reasonable care to Plaintiffs. Plaintiffs reasonably relied (to their detriment) on Defendants' performance of their obligations. Defendants were required to monitor the Loans and inform Plaintiffs of relevant information. Furthermore, Defendants held themselves out as having unique, specialized knowledge in marine finance loans.

77.     Defendants breached that duty of care. Defendants delegated many of their duties to GMTC but failed to ensure that the loans or the vessels were monitored. Defendants further failed to ensure that the mortgages were recorded in flag jurisdictions that would protect Plaintiffs' interests. It was negligent for Defendants to repeatedly lose track of the collateral that, as managers, they were paid millions to secure, safeguard, and monitor. It was negligent for Defendants to recommend and supervise a law firm to represent Lenders in connection with the loans without even disclosing that firm's substantial relationship with borrowers.

78.     The sales of vessels, the breach of the underlying loans agreements and the nonpayment of more than $87 million were proximately caused by and were foreseeable consequences of Defendants' negligence.

79.     Due to Defendants' breach of their duty to exercise reasonable care, Plaintiffs sustained damages, including but not limited to, loss of the principal investment and loss of the collateral used to secure the investments.

## VI.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.     Judgment in favor of Plaintiffs and against Defendants on Counts 1 through 4, and award Plaintiffs damages of an amount to be determined at trial, in an amount no less than $87 million plus statutory pre and post-judgment interest;

B.     Disgorgement of all compensation or fees paid to Defendants under the Agreement;

C.     Reimbursement for all expenses incurred by Plaintiffs in its recovery efforts;

D.     An award of reasonable attorney fees and costs incurred by Plaintiffs, as also required by the Agreement; and

E.     Such other and further relief as this Court deems just and proper.


Dated:  April 28, 2020
New York, New York                    Respectfully submitted,

                                      BAKER BOTTS L.L.P.


                                      David M. Howard
                                      30 Rockefeller Plaza
                                      New York, New York 10112
                                      Tel.: (212) 408-2551
                                      david.howard@bakerbotts.com

                                      Jonathan A. Shapiro (*pro hac vice* forthcoming)
                                      101 California Street
                                      San Francisco, California 94111
                                      jonathan.shapiro@bakerbotts.com
                                      Tel.: (415) 291-6204

                                      *Counsel for Plaintiffs YS GM MARFIN II LLC, YS GM MF VI LLC, YS GM MF VII LLC, YS GM MF VIII LLC, YS GM MF IX LLC, YS GM MF X LLC, YieldStreet Marine Finance, LLC, and YieldStreet Management, LLC.*