UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YS GM MARFIN II LLC, YS GM MF VI LLC, YS GM MF VII LLC, YS GM MF VIII LLC, YS GM MF IX LLC, YS GM MF X LLC, YIELDSTREET MARINE FINANCE, LLC, and YIELDSTREET MANAGEMENT, LLC,<br><br>                              Plaintiffs,<br><br>              - against -<br><br>FOUR WOOD CAPITAL ADVISORS, LLC, FOUR WOOD CAPITAL PARTNERS, LLC, STEVEN BAFFICO, and ANDREW SIMMONS,<br><br>                              Defendants. | **MEMORANDUM<br>OPINION & ORDER**<br><br>20 Civ. 3320 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiffs YS GM MARFIN II LLC, YS GM MF VI LLC, YS GM MF VII LLC, YS GM MF VIII LLC, YS GM MF IX LLC, YS GM MF X LLC (collectively, the "Special Purpose Entities" or the "Plaintiff Lenders"), YieldStreet Marine Finance, LLC, and YieldStreet Management, LLC, (YieldStreet Marine Finance and YieldStreet Management collectively, "YieldStreet") bring this action against Defendants Four Wood Capital Advisors, LLC, Four Wood Capital Partners, LLC (collectively, the "Four Wood Defendants"), Steven Baffico, and Andrew Simmons. (Am. Cmplt. (Dkt. No. 29)) The Amended Complaint asserts claims for fraud, aiding and abetting fraud, breach of fiduciary duty, negligent misrepresentation, negligence, and conversion against all Defendants (id. ¶¶ 114-23, 130-56), and breach of contract claims against the Four Wood Defendants. (Id. ¶¶ 124-29)

Defendants have moved to dismiss the Amended Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(6), and 9(b), and the doctrine of <u>forum non conveniens</u>.  (Def. Mot. (Dkt. No. 54))

For the reasons stated below, Defendants' Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction will be granted.

## BACKGROUND

### I.   FACTS

#### A.   The Parties

Plaintiffs are organized under Delaware law, and each has its principal place of business in New York.  (Am. Cmplt. (Dkt. No. 29) ¶¶ 17-24)  Defendant Four Wood Capital Partners is a private equity fund manager that is organized under New York law and has its principal place of business in New Jersey.  (<u>Id.</u> ¶ 25)  Defendant Four Wood Capital Advisors is a financial advisory firm and investment advisor that is organized under New York law and has its principal place of business in New Jersey.  (<u>Id.</u> ¶ 26)  Defendant Baffico was the managing partner of Defendant Four Wood Capital Advisors and chief executive officer of Defendant Four Wood Capital Partners, and resides in New Jersey.  (<u>Id.</u> ¶ 27)  Defendant Simmons was the chief executive officer of Global Marine Transport Capital LLC, which is an affiliate of Four Wood Capital Partners, and resides in Cyprus.  (<u>Id.</u> ¶ 28)

The Amended Complaint alleges subject matter jurisdiction based on maritime jurisdiction, pursuant to a maritime contract, under 28 U.S.C. § 1333(1).  (<u>Id.</u> ¶ 30)  The Amended Complaint further alleges supplemental jurisdiction over Plaintiffs' related state law claims, pursuant to 28 U.S.C. § 1367.  (<u>Id.</u> ¶ 31)  The Amended Complaint does not assert that there is diversity of citizenship jurisdiction, pursuant to 28 U.S.C. § 1332.

### B.   The Investment Management Agreement

On or about April 18, 2018, YieldStreet Marine Finance entered into an Investment Management Agreement with Four Wood Capital Advisors.  (Quigley Decl., Ex. 3 (Agreement) (Dkt. No. 59-3) at 2, 6)  The Investment Management Agreement provides that YieldStreet Marine Finance will form a number of "affiliated special purpose entit[ies]," and that each of these special purpose entities "shall become a party to this Agreement [by] executing a joinder supplement to [the] Agreement."  (Id. at 2)  Each of the special purpose entities – which are Plaintiff Lenders in this action – subsequently signed the "joinder supplement" to the Investment Management Agreement.  (Am. Cmplt. (Dkt. No. 29) ¶ 39; see, e.g., Isquith Decl., Ex. 1 (Dkt. No. 57-1) at 18-21)

The Amended Complaint alleges that "[t]he principal objective of the Agreement relates to maritime commerce, specifically the origination and financing of vessels to be acquired overseas, transported on navigable and international waterways, and ultimately sold for vessel deconstruction."[1]  (Am. Cmplt. (Dkt. No. 29) ¶ 30)  Plaintiffs further allege that "[t]he damages sought resulted from the destruction and dissipation of vessels that navigated international waters, ostensibly under monitoring by Defendants."  (Id.)

Pursuant to the Investment Management Agreement, Defendants were engaged "to provide investment management services with respect to ship finance transactions, loans or leases sourced and managed by [Four Wood Capital Advisors] for [YieldStreet Marine Finance and its affiliated special purpose entities]."  (Agreement (Dkt. No. 59-3) at 2)  According to Plaintiffs, "Defendants were required to originate, facilitate, monitor and manage alternative

---

[1]  The Court understands vessel "deconstruction" to be a type of recycling that extracts materials for resale from non-operational vessels.  (See Am. Cmplt. (Dkt. No. 29) ¶ 9 (referring to "deconstruction" as the "recycling of the metal" making up the vessels))

investments that target high-yield returns in specialty lending to overseas marine finance companies." (Am. Cmplt. (Dkt. No. 29) ¶ 41) Defendants were to "source prospective transactions from qualified owner/operators of middle market shipping companies." (Agreement (Dkt. No. 59-3) at 2) Under the Investment Management Agreement, Defendants were required to "monitor loan repayments, the underlying security and the compliance of the documented terms and covenants by the borrowers, taking action as (or if) directed by [YieldStreet Marine Finance and its affiliated special purpose entities] in the event of a breach of the agreed terms by the borrowers." (Id.) According to Plaintiffs, "[i]n the case of vessel-backed maritime loans, Defendants' obligations for 'monitoring' the underlying security required them to keep track of the location of the vessels, among many other obligations. This would have included independently verifying the vessels' location[s], such as [by] using a third-party tracking system." (Am. Cmplt. (Dkt. No. 29) ¶ 42) Defendants were also required to use "reasonable care" and "reasonable commercial judgment" in performing their duties under the Investment Management Agreement. (Agreement (Dkt. No. 59-3) at 3-4)

Defendants conducted business in their own names and in the name of Global Marine Transport Capital, their affiliate. (Am. Cmplt. (Dkt. No. 29) ¶ 50) While the Investment Management Agreement permits Four Wood Capital Advisors to delegate its duties to Global Marine Transport Capital, Four Wood Capital Advisors "remain[ed] primarily responsible for its duties and obligations [under the Agreement]." (Agreement (Dkt. No. 59-3) at 2) Defendants charged Plaintiffs more than $3 million for services provided under the Agreement. (Am. Cmplt. (Dkt. No. 29) ¶ 52)

### C.    Loans Made in Connection with the Investment Management Agreement

Between June 2018 and September 2019, Plaintiff Lenders extended six loans, totaling approximately $89.2 million, to fifteen companies "affiliated with the North Star Borrowers."[2] (Id. ¶¶ 53, 56-60)  Defendants sourced these transactions.  (Id.)  Plaintiff Lenders extended loans to the North Star Borrowers to finance vessel deconstructions.  (Id. ¶ 55)  North Star Borrowers sought loans to purchase vessels, which the North Star Borrowers would then sell to third-parties for recycling purposes.  (Id.)  "The deconstruction proceeds were then to be paid to [Plaintiff] Lenders under the loan agreements."  (Id.)  "The [l]oans were secured by collateral," which included "first priority ship mortgages on each of the vessels financed by the [l]oans, corporate guarantees, personal guarantees, [and] assignments of sales proceeds and/or insurance proceeds."  (Id. ¶ 62)  "North Star and the Lakhanis also served as guarantors for the [l]oans."  (Id.)

### D.    The Amended Complaint's Allegations of Fraud and Breach of Contract

According to Plaintiffs, the arrangement amongst Plaintiffs, Defendants, and the North Star Borrowers at first proceeded properly under the Investment Management Agreement.  (Id. ¶ 63)  By the beginning of June 2019, the North Star Borrowers had repaid in full a $9 million loan extended by a non-party affiliate of YieldStreet Marine Finance.  (Id.)  And between

---

[2]  According to the Amended Complaint, the North Star Borrowers are "entities associated with Tahir Lakhani and his sons."  (Am. Cmplt. (Dkt. No. 29) ¶ 11)  The principal and shareholders of North Star are "Tahir Lakhani, and his two sons, Ali and Hasan."  (Id. ¶¶ 38, 105)  The Amended Complaint identifies "the Dubai-based Lakhani family" as "the ultimate owners of the North Star Borrowers," and lists fifteen companies "affiliated with the North Star Borrowers."  (Id. ¶¶ 1, 53, 101)  The Amended Complaint provides no additional facts about who the Lakhani family is, what North Star is, or how the North Star Borrowers relate to the Lakhani family or to North Star.

2018 and early 2020, Plaintiffs had weekly calls with Defendants' representatives to discuss the status of the outstanding loans.  (Id. ¶ 64)

The Amended Complaint alleges, however, that during this period the North Star Borrowers and the Lakhanis were engaging in "a massive fraud – deconstructing, double-flagging, and obtaining duplicate financing for many of the vessels that formed the collateral for the [l]oans."  (Id. ¶ 65)  Plaintiffs further allege that "much of the loan proceeds obtained by the North Star Borrowers [were] used to repay other lenders' loan facilities, rather than being used to finance the purchase of vessels, or was otherwise misappropriated."  (Id.)

According to Plaintiffs, Defendants did not comply with their "obligation under the [Investment Management] Agreement to manage, monitor and service the [l]oans and the North Star Borrowers' compliance with their underlying loan agreements."  (Id. ¶ 66)  "But to make matters worse, after the [l]oans were originated and distributed, Defendants failed to comply with their fiduciary and contractual duties they owed to Plaintiffs, substantially assisted the global fraud perpetrated by the North Star Borrowers, and made fraudulent representations about their own performance under the [Investment Management] Agreement."  (Id.)  Although Defendants represented that they were "a 'one stop shop' with unique, highly-specialized knowledge regarding the overseas market for vessel deconstruction lending, they never once informed Plaintiffs of the[] deceitful actions by the North Star Borrowers."  (Id.)

"Defendants also failed to exercise reasonable care . . . when it came to securing and safeguarding [Plaintiff] Lenders' interests in the vessels as creditors."  (Id. ¶ 67)  "Defendants failed to secure and track the vessels and failed to ensure that the other professionals they supervised did so in an effective manner and free of conflicts."  (Id.)  As part of the alleged fraud, "Defendants continued to try to get Plaintiffs and their affiliates to finance

other Lakhani-related transactions through at least the end of March 2020." (Id. ¶ 69) Defendants also "encourag[ed] Plaintiffs to grant the North Star Borrowers extensions on existing loans extended by Plaintiffs, [so that] Defendants [could] obtain[] additional management fees." (Id. ¶ 70)

Plaintiffs further allege that in or about August 2019, Defendants provided Plaintiff YieldStreet Marine Finance with false documents to induce Plaintiff YS GM MF X to lend $14.5 million to the Lakhanis, to finance the purchase of a vessel. (Id. ¶¶ 71-73) Before agreeing to lend additional money to the Lakhanis, Plaintiffs questioned Defendants "about the status of the existing [loan] facilities that had been extended to the North Star Borrowers, and to confirm [that] repayment on those [loan] facilities would be forthcoming." (Id. ¶ 74)

Defendant Simmons – acting on behalf of the Four Wood Defendants – arranged and participated in a call between YieldStreet Marine Finance and Tahir Lakhani, during which Lakhani represented that "five vessels had been sold to ship breakers[,] and that North Star would deliver [these vessels] to the ship breakers in late September. [YieldStreet] Marine [Finance's] representatives asked Defendants to have North Star provide documentation of these sales." (Id. ¶ 75)

In late August 2019, Defendant Simmons and "another of Defendants' officers" – forwarded to YieldStreet Marine Finance "official sale memoranda of agreement" showing that the North Star Borrowers had agreed to sell five vessels to ship breakers, with delivery of those vessels to take place in late September or early October. (Id. ¶ 76) Plaintiff Lenders had loaned money to the North Star Borrowers to finance the purchase of these five vessels (id. ¶ 74), and the sales agreements that Defendants provided to YieldStreet Marine Finance provided "documentary assurance that repayment on the outstanding [l]oans would be forthcoming." (Id.

¶ 77)  Defendant Simmons did not "raise any concerns about the legitimacy of these [sales agreements]."  (Id. ¶ 77)  The sales agreements thus encouraged Plaintiff Lenders "to consider extending the North Star Borrowers financing for [additional purchases of vessels]" (id. ¶¶ 76-77), and "[b]ased in part on these documents, on or around September 11, 2019, Plaintiff YS GM MF X . . . made a loan of $14,500,000 to a North Star Borrower for the purchase of [another vessel]."  (Id. ¶ 78)

According to Plaintiffs, however, the sales agreements that Defendants provided were fraudulent.  (Id. ¶ 79)  Most, if not all, of the vessels that are the subject of the sales agreements no longer existed, because they "had been scrapped by ship breakers months prior, in the spring of 2019," or "had been delivered . . . for deconstruction earlier in the summer."  (Id.)  Plaintiffs allege that Defendants did not meet their obligation under the Agreement to track and monitor the status of the vessels that were collateral for the loans, even though Defendant Simmons assured Plaintiffs that Defendants were "tracking the vessels."  (Id. ¶ 80)  Plaintiffs further allege that Defendants "feigned performance under the Agreement but instead substantially assisted the fraud carried out by the Lakhanis and the North Star Borrowers" by providing Plaintiffs with false sales agreements, by falsely assuring Defendants that they were tracking vessels that had already been deconstructed, and by repeatedly assuring Plaintiffs about the North Star Borrowers' performance.  (Id. ¶¶ 81-82)

In September 2019, the North Star Borrowers missed payments due under certain loans.  (Id. ¶ 83)  Defendants advised Plaintiffs to grant North Star extensions of time to make the payments.  (Id.)  According to Plaintiffs, Defendant Simmons, falsely represented to Plaintiffs on October 21, 2019, that "there were legitimate reasons for the delay in payment, i.e., issues with Chinese banks[,] and that Lakhani was 'in a constant dialogue with the Chinese

regarding further payments due under the facility.'" (Id. ¶ 86)  Simmons assured Plaintiff that

there was no cause for concern and that the payments would be forthcoming.  (Id. ¶¶ 84, 86-88)

Defendant Baffico also assured Plaintiffs that the Four Wood Defendants would work with North

Star to provide information concerning the late payments.  (Id. ¶ 89)

        In November 2019, Defendant Simmons notified Plaintiffs that a payment had

been received from the North Star Borrowers, but he did not disclose that the North Star

Borrowers had paid only about ten percent of what Plaintiffs were owed.  (Id. ¶ 90)  Defendant

Simmons assured Plaintiffs that additional funds would arrive in the next few days, and

Defendant Baffico assured that they were "closely monitoring the situation and speaking with

[Lakhani] several times a day."  (Id.)

        On January 9, 2020, Defendant Simmons "forwarded to [YieldStreet] Marine

[Finance] coordinates purporting to reflect the locations of certain financed vessels."  (Id. ¶ 94)

According to Plaintiffs, it is obvious that Simmons did not verify this information, because he

"forwarded the [underlying email reflecting the location information] only three minutes after

receiving it."  (Id.)

        In January and February 2020, additional North Star Borrowers began to miss

payments.  (Id. ¶ 95)  Plaintiffs requested that Stephenson Harwood, a law firm recommended

and supervised by Defendants, "serve [Plaintiff] Lenders' notices of default and acceleration on

the North Star Borrowers."  (Id. ¶ 96)  "Stephenson Harwood refused to do so, asserting that they

would not take public action adverse or provocative to the Lakhanis because of [an] undisclosed

conflict of interest."  (Id.)

        Plaintiffs allege that Defendants did not exercise reasonable care in

recommending, retaining, and supervising Stephenson Harwood, and "never disclosed that

Stephenson Harwood had a longstanding and substantial business relationship with the Lakhanis (the ultimate owners of the North Star Borrowers)."  (Id. ¶¶ 100-01)

In late February 2020, Plaintiffs learned from a third party that North Star was in voluntary liquidation proceedings in St. Kitts and Nevis.  (Id. ¶ 97)  Defendants, however, "continued to vouch for the Lakhanis."  (Id. ¶ 98)  Indeed, Defendant Simmons told Plaintiffs on February 17, 2020, that he had recently met with Tahir Lakhani, and that Lakhani had assured Simmons that "all vessels financed [were] in place and [that he would] obtain positions tomorrow or Wednesday."  (Id.)  No such location information was provided.  (Id.)

In March 2020, Plaintiffs exercised their contractual right to terminate and accelerate the loans, requiring the immediate payment of the remaining principal and default interest.  (Id. ¶ 99)  As of March 31, 2020, approximately $76.7 million was in default across five North Star loans.  (Id.)  As of the filing of the Amended Complaint, the North Star Borrowers had not repaid any of that amount.  (Id.)

The Amended Complaint alleges numerous ways in which Defendants did not exercise reasonable care in performing their duties under the Agreement.  According to Plaintiffs, "Defendants . . . allowed critical mortgages and related documents securing the loans to be recorded in foreign flag jurisdictions that Defendants knew (or should have known) were not reliably creditor-friendly or otherwise protective of creditors' rights."  (Id. ¶ 102) "Defendants never informed Plaintiffs of the commercial creditor risks to their collateral interests in these foreign jurisdictions," and did not mitigate the risk.  (Id.)

Defendants also did not "use reasonable care in monitoring the [l]oans and the collateral, despite assurances that the vessels were secured."  (Id. ¶ 104)  According to Plaintiffs, vessels that were collateral for the loans, and were supposedly en route to "ship breakers," "were

in fact beached on the coasts of Bangladesh and other South Asian countries." (Id.)  "At least

twelve (12) vessels financed by and secured as collateral for the [l]oans were sold and/or

deconstructed overseas in countries such as Pakistan and India."  (Id.)  "Defendants also failed to

disclose that four (4) other vessels may have been double-financed by other lenders (and that the

Lakhanis therefore had no equity in those vessels."  (Id.)

Plaintiffs further allege that Defendants charged "hundreds of thousands of dollars

of excessive fees to which Defendants had no contractual right" under the Investment

Management Agreement.  (Id. ¶ 108)

On April 27, 2020, Plaintiffs terminated the Investment Management Agreement

for cause.  (Id. ¶ 110)

As noted above, the Amended Complaint asserts claims against all Defendants for

fraud, aiding and abetting fraud, breach of fiduciary duty, negligent misrepresentation,

negligence, and conversion.  (Id. ¶¶ 114-23, 130-56)  Plaintiffs also assert claims against the

Four Wood Defendants for breach of contract.  (Id. ¶¶ 124-29)  The Amended Complaint seeks,

inter alia, $87 million in damages.  (Id. at 43)

## II.    PROCEDURAL HISTORY

The Complaint was filed on April 28, 2020.  (Cmplt. (Dkt. No. 1))  In a July 20,

2020 letter, the Four Wood Defendants request a pre-motion conference concerning an

anticipated motion to dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6).  (July 20, 2020 Def. Ltr. (Dkt. No. 18) at 1)  In a July 23, 2020 letter, Plaintiffs oppose

the Four Wood Defendants' anticipated motion.  (July 23, 2020 Pltf. Ltr. (Dkt. No. 19) at 1)  On

August 25, 2020, this Court set a briefing schedule for Defendants' motion to dismiss.  (Aug. 25, 2020 Order (Dkt. No. 23))

On September 21, 2020, Plaintiffs requested leave to file an amended complaint, which, inter alia, adds Baffico and Simmons as Defendants.  (Sept. 21, 2020 Pltf. Ltr. (Dkt. No. 26) at 1; id., Ex. A)  On September 22, 2020, this Court granted Plaintiffs' request, and directed the parties to confer and propose a revised briefing schedule for Defendants' motion to dismiss.  (Sept. 22, 2020 Order (Dkt. No. 27))  That same day, Plaintiffs filed the Amended Complaint.  (Am. Cmplt. (Dkt. No. 29))

On September 29, 2020, Plaintiffs and the Four Woods Defendants, along with Defendant Baffico, filed letters proposing different briefing schedules for Defendants' motion to dismiss.  (Sept. 29, 2020 Pltf. Ltr. (Dkt. No. 37); Sept. 29, 2020 Def. Ltr. (Dkt. No. 38))  In a February 5, 2021 letter, Defendant Simmons – with the consent of the other Defendants – requests a pre-motion conference concerning an anticipated motion to dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6).  (Feb. 5, 2020 Simmons Ltr. (Dkt. No. 44) at 1)  On February 10, 2021, Plaintiffs filed an opposition.  (Feb. 10, 2021 Pltf. Ltr. (Dkt. No. 45) at 1)  In a June 16, 2021 letter, Plaintiffs request that the Court set a briefing schedule for Defendants' anticipated motions to dismiss.  (June 16, 2021 Pltf. Ltr. (Dkt. No. 49) at 1)  On August 11, 2021, this Court set a briefing schedule for Defendants' motion to dismiss.  (Aug. 11, 2021 Order (Dkt. No. 51))

Defendants' motion to dismiss was filed on November 2, 2021.  (Def. Mot. (Dkt. No. 54))

## DISCUSSION

## I.   LEGAL STANDARDS

### A.   Fed. R. Civ. P. 12(b)(1)

"[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit ([i.e.,] subject-matter jurisdiction)." Sinochem Int'l Co. Ltd. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 430-31 (2007).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

Where subject matter jurisdiction is challenged, a plaintiff "bear[s] the burden of 'showing by a preponderance of the evidence that subject matter jurisdiction exists.'" APWU v. Potter, 343 F.3d 619, 623 (2d Cir. 2003) (quoting Lunney v. United States, 319 F.3d 550, 554 (2d Cir. 2003)); see also Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005) (citing Luckett v. Bure, 290 F.3d 493, 497 (2d Cir. 2002)) ("The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence.").  "Under Rule 12(b)(1), even 'a facially sufficient complaint may be dismissed for lack of subject matter jurisdiction if the asserted basis for jurisdiction is not sufficient.'" Castillo v. Rice, 581 F. Supp. 2d 468, 471 (S.D.N.Y. 2008) (quoting Frisone v. Pepsico, Inc., 369 F. Supp. 2d 464, 469 (S.D.N.Y. 2005)).

In considering a Rule 12(b)(1) motion, a court "must accept as true all material factual allegations in the complaint." J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004).  The court "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but . . . may not rely on conclusory or hearsay statements

contained in the affidavits." Id.; see also Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008), aff'd, 561 U.S. 247 (2010) (citing Makarova, 201 F.3d at 113) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside the pleadings.").  In resolving a Rule 12(b)(1) motion, a court may also "consider 'matters of which judicial notice may be taken.'" Greenblatt v. Gluck, No. 03 Civ. 597 (RWS), 2003 WL 1344953, at *1 n.1 (S.D.N.Y. Mar. 19, 2003) (quoting Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1993)).

>       **B.**    **Maritime Jurisdiction**

>       The United States Constitution extends the federal judicial power to "all [c]ases of admiralty and maritime [j]urisdiction," U.S. Const. Art. III, § 2, and pursuant to federal statute, federal district courts have exclusive jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1).  "This grant provides for jurisdiction over claims arising from maritime contracts." d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd., 886 F.3d 216, 223 (2d Cir. 2018) (citing Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York, 822 F.3d 620, 632 (2d Cir. 2016)).

>       There are "no[] . . . clean lines between maritime and nonmaritime contracts." Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 23 (2004).  "Instead, general principles steer [the] 'case-by-case approach' for determining whether an agreement is a maritime contract." d'Amico Dry Ltd., 886 F.3d at 223 (quoting Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc., 413 F.3d 307, 311 (2d Cir. 2005)).

>       For many years, the Second Circuit instructed district courts considering whether a claim falls within admiralty jurisdiction to conduct a "threshold inquiry" that involves "initially determin[ing] whether the subject matter of the dispute is so attenuated from the business of

14

maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction." In re Balfour MacLaine Int'l Ltd., 85 F.3d 68, 74 (2d Cir. 1996) (quoting Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 200 (2d Cir. 1992)).  If the subject matter is not "so attenuated," the court would then inquire into the contract's subject matter.  Id.  While "a contract [would] not sustain admiralty jurisdiction unless the contract [were] wholly maritime in nature," the Second Circuit set out "two exceptions to this general rule."  Atl. Mut. Ins. Co., 968 F.2d at 199.  "First, in a contract containing both maritime and non-maritime elements, a claim under a maritime portion of a contract [would] sustain admiralty jurisdiction where the maritime obligations [could] be 'separately enforced without prejudice to the rest.'"  Id. (quoting Compagnie Francaise De Navigation a Vapeur v. Bonnasse, 19 F.2d 777, 779 (2d Cir. 1927); citing Berwind-White Coal Mining Co. v. City of New York, 135 F.2d 443, 447 (2d Cir. 1943)). "Second, where the non-maritime elements [were] merely 'incidental' in an otherwise maritime contract, admiralty jurisdiction [would] encompass the entire contract."  Id. (citing Simon v. Intercontinental Transp. (ICT) B.V., 882 F.2d 1435, 1443 (9th Cir. 1989); Kuehne & Nagel (AG & Co) v. Geosource, Inc., 874 F.2d 283, 290 (5th Cir. 1989)).

In Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14 (2004), however, the Supreme Court clarified the standard for determining whether a contract is maritime.  In Kirby, the Court addressed whether bills of lading governing the transport of goods by sea from Australia to Georgia, and then inland to Alabama, were maritime contracts.  Kirby, 543 U.S. at 18-21. Emphasizing that "'[t]he boundaries of admiralty jurisdiction over contracts . . . [are] conceptual rather than spatial,'" id. at 23 (quoting Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961)), the Court held that whether a contract is maritime "'depends upon . . . the nature and character of the contract,' and the true criterion is whether [the contract] has 'reference to maritime service or

maritime transactions.'" Id. (omission in original) (quoting N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co., 249 U.S. 119, 125 (1919)).  The Court also noted that "the 'fundamental interest giving rise to maritime jurisdiction is the "protection of maritime commerce."'" Id. at 25 (emphasis in original) (quoting Exxon Corp. v. Cent. Gulf Lines, Inc., 500 U.S. 603, 608 (1991); Sisson v. Ruby, 497 U.S. 358, 367 (1990)).  Accordingly, courts should "focus[] [their] inquiry on whether the principal objective of a contract is maritime commerce."  Id.

Applying this analysis, the Court held that the bills of lading at issue in Kirby were maritime contracts, "because their primary objective is to accomplish the transportation of goods by sea from Australia to the eastern coast of the United States." Id. at 24.  That the bills of lading also "call for some performance on land" – the transportation of goods between Georgia and Alabama – "does not alter the essentially maritime nature of the contracts."  Id.

In light of Kirby, the Second Circuit has adjusted its analysis.  As an initial matter, with respect to the "threshold inquiry" discussed above, the Second Circuit has remarked that "the absence of any discussion by the Supreme Court [in Kirby] of a 'threshold inquiry' akin to that found in [the Second Circuit's] precedents is notable."  Folksamerica Reinsurance Co., 413 F.3d at 314.  This Court has concluded "that the previously required 'threshold inquiry' is inconsistent with Kirby."  XL Specialty Ins. Co. v. Prestige Fragrances, Inc., 420 F. Supp. 3d 172, 189 n.18 (S.D.N.Y. 2019).

As to what the Second Circuit had referred to as the "incidental exception" – where "the non-maritime elements [of a contract] are merely 'incidental' in an otherwise maritime contract" – the Second Circuit has instructed that district courts "should focus 'on whether the principal objective of a contract is maritime commerce,' . . . rather than on whether the non-maritime components are properly characterized as more than 'incidental' or 'merely

incidental' to the contract." <u>Folksamerica Reinsurance Co.</u>, 413 F.3d at 315 (quoting <u>Kirby</u>, 543 U.S. at 25).

In this regard, the Second Circuit has emphasized that

the north star for maritime contract jurisdiction is an agreement's relationship with maritime commerce, not its tie to any particular vessel (or seaman, or shipment). Requiring a connection with a specific vessel is in tension with <u>Kirby</u>'s express instruction that the existence of maritime contract jurisdiction cannot be resolved by resort to questions like whether a vessel was involved in the dispute or where the contract was made or meant to be performed.

<u>d'Amico Dry Ltd.</u>, 886 F.3d at 226 (citing <u>Kirby</u>, 543 U.S. at 23-24; <u>Folksamerica Reinsurance Co.</u>, 413 F.3d at 323-34).

## II.   <u>ANALYSIS</u>

Defendants argue that the Agreement is "not a 'maritime contract,'" because "[i]t does not involve vessel operation." (Def. Br. (Dkt. No. 55) at 22)  According to Defendants, "[c]ontracts to purchase ships are not maritime [contracts]," and, in any event, "[t]he [Investment Management Agreement] is several steps remote from such a non-maritime contract." (<u>Id.</u> at 23)  Defendants further argue that "[t]he [Investment Management Agreement] is for the provision of investment management services by Four Wood [Capital Advisors] to [Plaintiffs] so that [Plaintiffs] could lend money to third parties (like North Star) so that those third parties could purchase ships." (<u>Id.</u> at 22-23)  "Plaintiffs' allegations are [thus] based on financial management activities taking place on land."[3]  (<u>Id.</u> at 23)

---

[3]  Defendants also contend that "[c]ontracts preliminary to maritime contracts are not maritime contracts," and that, "[a]t most, the [Investment Management Agreement] is supportive of [Plaintiffs'] loans[,] [and] [a]greements that support loans related to maritime commerce are not themselves maritime." (Def. Br. (Dkt. No. 55) at 26-27)  Defendants further argue that "[t]he [preliminary contract] doctrine in this Circuit – set forth more than a century ago and upheld since – provides in pertinent part that disputes arising out of preliminary services contracts do not invoke maritime jurisdiction." <u>Shipping Fin. Servs. Corp. v. Drakos</u>, 140 F.3d 129, 132 (2d Cir. 1998); <u>see id.</u> at 132-33 (alteration in original) (quoting <u>The Thames</u>, 10 F. 848, 848

(S.D.N.Y. 1881) ("'The distinction between preliminary services leading to a maritime contract and such contracts themselves ha[s] been affirmed in this country from the first.'").

In Exxon Corp. v. Cent. Gulf Lines, Inc., the Supreme Court considered "whether admiralty jurisdiction extends to claims arising from agency contracts." Exxon, 500 U.S. 603, 604 (1991). The Court overruled Minturn v. Maynard, 58 U.S. 477 (1854), which "ha[d] been interpreted by some lower courts as establishing a per se rule excluding agency contracts from admiralty." Id. at 605.  Reasoning that "the trend in modern admiralty case law[] . . . is to focus the jurisdictional inquiry upon claims whether the nature of the transaction was maritime," id. at 611 (citing Kossick, 365 U.S. at 735-38; Krauss Bros. Lumber Co. v. Dimon S.S. Corp., 290 U.S. 117, 124 (1933)), the Court found that "the proposition for which Minturn stands – a per se bar of agency contracts from admiralty – ill serves the purpose of the grant of admiralty jurisdiction."  Id.  The Court further stated that "the admiralty jurisdiction is designed to protect maritime commerce," and that "[t]here is nothing in the nature of an agency relationship that necessarily excludes such relationships from the realm of maritime commerce."  Id.  Finally, the Court directed that, "[r]ather than apply a rule excluding all or certain agency contracts from the realm of admiralty, lower courts should look to the subject matter of the agency contract and determine whether the services performed under the contract are maritime in nature."  Id. at 612.

The Second Circuit has noted that "although Exxon plainly discourages per se exclusions to maritime claims, it stops short of entirely eliminating the preliminary contract doctrine." Shipping Fin. Servs. Corp., 140 F.3d at 133; see also Harley Mullion & Co. v. Caverton Marine Ltd., No. 08 Civ. 5435 (BSJ), 2008 WL 4905460, at *3 n.3 (S.D.N.Y. Aug. 7, 2008) (citing Shipping Fin. Servs. Corp., 140 F.3d at 134) ("[W]hether the 'preliminary contract doctrine' is still good law after the Supreme Court's decision in Exxon is an open question in this Circuit.").

Assuming arguendo that the preliminary contracts doctrine survives Exxon, that doctrine is not applicable here.  Although the Amended Complaint pleads that Defendants provided services intended to be preliminary to prospective contracts to finance ship acquisitions between Plaintiffs and third parties, Plaintiffs also plead that Defendants were obligated under the Investment Management Agreement to provide ongoing services, including, inter alia,

> monitor[ing] loan repayments, the underlying security and the compliance of the documented terms and covenants by the borrowers, taking action as (or if) directed by the Investor in the event of a breach of the agreed terms by the borrowers. . . ; [and]

> calculat[ing] portfolio performance and deliver[ing] reporting metrics to the Investor on a quarterly basis. . . .

(Agreement (Dkt. No. 59-3) at 2)  Cf. Tankship Int'l, LLC v. El Paso Merch. Energy-Petroleum Co., 428 F. Supp. 2d 93, 101 (D. Conn. 2006) (holding that agreement was preliminary contract because the evidence "does not support the conclusion that any ongoing maritime services agreement was consummated between [the parties] that contemplated [the plaintiff broker] playing a role beyond liaison for facilitating communication and distribution of information relating to the operation of the vessels among participants").  Because the Amended Complaint

Plaintiffs assert that the Investment Management Agreement is a maritime contract because "there is no serious question that the 'principal objective' of the Agreement relates to maritime services and maritime transactions and that maritime jurisdiction therefore exists."  (Pltf. Opp. (Dkt. No. 58) at 28)  In this regard, Plaintiffs note that the Amended Complaint alleges that

> "[t]he principal objective of the Agreement relates to maritime commerce, specifically the origination and financing of vessels to be acquired overseas, transported on navigable and international waterways, and ultimately sold for vessel deconstruction.  The damages sought resulted from the destruction and dissipation of vessels that navigated international waters, ostensibly under monitoring by Defendants."

(Id. at 27 (alteration in original) (quoting Am. Cmplt. (Dkt. No. 29) ¶ 30))  Plaintiffs further note that the Investment Management Agreement was entered into by two "marine-focused entities – [YieldStreet] Marine [Finance] and [Four Wood Capital Advisors], explicitly defined to include [Four Wood Capital Advisors'] affiliate 'Maritime Finance Advisors' – and emblazoned with the logo of another affiliate, Global Marine [Transport Capital], on every page."  (Id. (emphasis omitted))

A.      **Relevant Provisions of the Investment Management Agreement**

In determining the nature of the Investment Management Agreement, the Court notes at the outset that the parties entitled their agreement, "Investment Management Agreement."  (Agreement (Dkt. No. 59-3) at 2)  The parties' agreement was entered into by Four Wood Capital Advisors, "a Registered Investment Advisor," and YieldStreet Marine Finance, a

---

pleads that Defendant provided ongoing services pursuant to the Investment Management Agreement, the Agreement is not a preliminary contract.

marine finance company.[4]  (Id.)  YieldStreet Marine Finance and its "affiliated special purpose

entit[ies]" are referred to as the "Investor."  (Id.)

> In the Investment Management Agreement, Four Woods Capital Advisors agrees

> to provide investment management services with respect to ship finance
> transactions, loans or leases sourced and managed by [Four Wood Capital
> Advisors] for the Investor.

(Id.)

> Four Wood Capital Advisors' duties and responsibilities under the Investment

Management Agreement are set forth in a section of the Agreement entitled "Scope of Manager

Services & Responsibilities."  (Id.)  Four Wood Capital Advisors agrees to

> originate, perform due diligence, and under the direction, guidance and approval of the
> Investor, manage and service the investments which comprise the Investor's Account in
> accordance with the Servicing Standards; . . .

> source prospective transactions from qualified owner/operators of middle market
> shipping companies for the Investor within the agreed parameters; . . .

> originate and perform due diligence on a proposed borrower, asset and collateral and
> develop a proposed transaction structure; . . .

> negotiate the terms and conditions with prospective borrowers; . . .

> monitor loan repayments, the underlying security and the compliance of the
> documented terms and covenants by the borrowers, taking action as (or if)
> directed by the Investor in the event of a breach of the agreed terms by the
> borrowers.  Any such actions shall be taken in accordance with the Servicing
> Standards unless otherwise directed by Investor; . . .

> calculate portfolio performance and deliver reporting metrics to the Investor on a
> quarterly basis, or as directed by Investor; . . .

> prepare, at its own expense, an information memorandum or similar disclosure
> document, containing all material information necessary for an investor to
> evaluate [the Shipping Loan investment opportunities], including but not limited

---

[4]  The Agreement provides that Four Wood Capital Advisors "may utilize its affiliate, Maritime
Finance Advisors IKE ('**MFA**') who may provide sub-advisory and/or support services to [Four
Wood Capital Advisors], (referred to collectively as '[Four Wood Capital Advisors]' or the
'Manager')."  (Agreement (Dkt. No. 59-3) at 2) (emphasis in original)

to, information relating to [Four Wood Capital Advisors], [the] borrower, industry information, fees paid to [Four Wood Capital Advisors], any conflict or potential conflict of interest with respect to [Four Wood Capital Advisors] and [the] borrower, or YieldStreet or its affiliates, collateral description, risk factors, and investment terms; [and]

provide Investor servicing reports as set forth in [Exhibit A to the Investment Management Agreement] in a form mutually agreed to by the parties.

(Id. at 2, 4, 13)

Four Wood Capital Advisors also agrees to

provide Investor with:  (i) copies of all financial statements or financial information received by [Four Wood Capital Advisors] from [the] borrower pursuant to each loan agreement . . . (ii) notice of the occurrence of an "Event of Default" (as such term is defined in each loan agreement); (iii) notice of any event or condition which [Four Wood Capital Advisors] believes could be reasonably likely to have a material adverse effect on the ability of a borrower to repay a loan by the maturity date then in effect; and (iv) any other material notices, reporting or documents received by [Four Wood Capital Advisors] in connection with the loans.

(Id. at 4)

Finally, Four Wood Capital Advisors agrees to "use its reasonable commercial judgment in accordance with reasonably industry standards to carry[] out its duties [under the Investment Management Agreement]," and further agrees to

monitor, collect, administer and service each loan with reasonable care using that degree of skill and attention that is (i) deemed commercially reasonable in the industry, and (ii) no less than the degree of skill and attention it uses in servicing and administering similar loans for its own account, the account of its affiliates, or for the account of other investors and in all cases in accordance with applicable laws (collectively, the "**Servicing Standard**").

(Id. at 3-4) (emphasis in original).[5]

---

[5]  The Investment Management Agreement also provides that it "is to be governed by and interpreted in accordance with the laws of the State of New York without giving effect to principles of conflicts of law."  (Agreement (Dkt. No. 59-3) at 5)

Schedule A to the Investment Management Agreement contains the "Marine Vessels Financing Separate Account Investment Guidelines" (the "Investment Guidelines").  (Id. at 7)  The Investment Guidelines describe the services of Four Wood Capital Advisors as follows:

> [Four Wood Capital Advisors] will source loans from shipping companies for the Investor within the agreed policy.  At the direction of and with approval of Investor, it will negotiate the terms with the borrowers, and post-closing monitor the loans, the underlying security and the compliance of the documented terms by the borrowers (taking actions authorized by the Investors in the event of a breach of the agreed terms by the borrowers), reporting thereon to the Investor on a regular basis in accordance with the Servicing Standard.

(Id.)  The Investment Guidelines further state that, "[b]y its nature, the Marine Vessels Financing Separate Account product is a strategy concentrated in maritime asset investments.  Investor will loan up to 100% of the Commitments in the financing of vessels and other maritime assets."  (Id.)

The Investment Guidelines also describe in detail the investment strategy that Four Wood Capital Advisors is to perform:

> [Four Wood Capital Advisors'] strategy emphasizes more stable, fee-based cash flow segments of the maritime asset class.  [Four Wood Capital Advisors] seeks to create a portfolio of U.S. dollar-denominated, senior secured, first-lien loans made to owners/operators of privately-held shipping companies, serving the global shipping industry.  At the direction of and with approval of Investor, [Four Wood Capital Advisors] will structure and implement direct lending transactions to the shipping industry with a focus primarily on independent, middle-market private shipping companies.  Generally, [Four Wood Capital Advisors] will seek to deliver gross unlevered Internal Rates of Return ("**IRR**") of at least 10% per annum in such transactions and further outlined in attached Schedule E.  Generally, [Four Wood Capital Advisors] will be focused on loans below 75% loan-to-value ("**LTV**") transactions with minimum loan sizes of $5-10 million, with at least 125% Asset Protection Clauses ("**APC**"), minimum working capital requirements, additional collateral backing, corporate and/or personal guarantees and rigorous ongoing loan surveillance and borrower oversight.  [Four Wood Capital Advisors] believes that financing vessels across this sector provides superior relative value and risk-adjusted returns.  In addition, [Four Wood Capital

Advisors] may introduce loans that are not senior secured debt if this may be
deemed reasonable form a risk-reward prospective.

(Id.) (emphasis in original)

### B. Whether the Investment Management Agreement is a Maritime Contract

As the above analysis of the Investment Management Agreement makes clear, the
"principal objective" of the Agreement is investment management and not maritime commerce.
The Agreement governs the relationship between Four Woods Capital Advisors – a registered
investment advisor – and YieldStreet Marine Finance, a company that is engaged in financing
other companies interested in purchasing ocean vessels for recycling purposes.  In the
Agreement, Four Woods Capital Advisors takes on a wide variety of duties and obligations, all
of which fall within the realm of investment management:  sourcing and managing the loans
made by YieldStreet Marine Finance; conducting the necessary due diligence; negotiating with
prospective borrowers; monitoring loan repayments and the underlying security; and calculating
portfolio performance and reporting on performance to YieldStreet Marine Finance.  (Agreement
(Dkt. No. 59-3) at 2, 4, 13)  Contrary to Plaintiffs' arguments, the fact that Four Woods Capital
Advisors is assisting YieldStreet Marine Finance and its affiliated special purpose entities in
connection with loans that they are making to third parties for the purpose of purchasing ships
for recycling does not convert an investment management agreement into a maritime contract.

Plaintiffs argue, however, that "the fact that the Agreement 'involves investment
management services' or that it required [Four Wood Capital Advisors] . . . to be a registered
investment [advisor] . . . [does not] mean its 'principal objective is not related to maritime
[commerce.']"  (Pltf. Opp. (Dkt. No. 58) at 29 (quoting Def. Br. (Dkt. No. 55) at 24, 30))
Plaintiffs contend that Defendants "explicitly agreed they would 'provide investment
management services with respect to ship finance transactions,'" which "expressly included

'sourc[ing] prospective transactions from qualified owner/operators of middle market shipping companies . . . ,' retaining a 'maritime law firm,' and 'manag[ing] and servic[ing]' marine-related investments, particularly by monitoring the status of those vessels, which formed the collateral for the loans."  (Id. at 29-30 (alterations in original) (footnotes omitted) (quoting Agreement (Dkt. No. 59-3) at 2))  Moreover, "under [Section] 11 of the Agreement, Defendants were required to submit servicing reports . . . regarding the loans and underlying vessels."  (Id. at 30)

As explained below, however, none of these provisions of the Investment Management Agreement demonstrate that it is a maritime contract.

As an initial matter, in applying Kirby, courts in this District have held that "the overwhelming weight of authority, in the Second Circuit and beyond, [remains] that a contract for the sale of a ship is not maritime in nature."  Polestar Mar. Ltd. v. Nanjing Ocean Shipping Co. Ltd., 631 F. Supp. 2d 304, 307 (S.D.N.Y. 2009) (collecting cases); see also Sea Trade Mar. Corp. v. Coutsodontis, No. 09 Civ 488 (BSJ) (HBP), 2012 WL 3594288, at *4 (S.D.N.Y. Aug. 16, 2012) ("It is well settled that, while a contract for the use or charter of a vessel is maritime in nature, the contract for a sale of a vessel is non-maritime."); Aggelikos Prostatis Corp. v. Shun Da Shipping Grp. Ltd., 646 F. Supp. 2d 330, 334 (S.D.N.Y. 2009) ("[I]t is well established that the Court lacks admiralty jurisdiction over contracts for the sale of vessels."); Vrita Marine Co. v. Seagulf Trading LLC, 572 F. Supp. 2d 411, 411 (S.D.N.Y. 2008) ("[C]ontracts for the sale of a vessel are not maritime in nature."); see also Unicorn Bulk Traders Ltd. v. Fortune Mar. Enters., Inc., No. 08 Civ. 9710 (PGG), 2009 WL 125751, at *2 (S.D.N.Y. Jan. 20, 2009) ("[T]he Second Circuit has explicitly held that breach of a contract to sell a vessel does not give rise to maritime jurisdiction.  Until the Second Circuit overrules that precedent, this Court is obliged to

24

follow it.").  Moreover, "[a] contract for the sale of a vessel that is to be beached and demolished does not have maritime commerce as its 'primary objective,' . . . even if the contract required the vessel to be delivered to her 'designated breaking up plot . . .' under her own power."  A. Elephant Corp. v. HiFocus Grp. Ltd., No. 08 Civ. 9969 (HB), 2009 WL 648893, at *4 (S.D.N.Y. Mar. 11, 2009) (quoting Folksamerica Reinsurance Co., 413 F.3d at 315).

The Investment Management Agreement is, of course, even more remote from maritime commerce than the cases discussed above involving the sale of a vessel, because it is directed to the financing of loans to third parties so that they may purchase vessels.  Moreover, none of the cases cited by Plaintiffs support their assertion that the Investment Management Agreement is a maritime contract.

In Williamson v. Recovery Ltd. P'ship, 542 F.3d 43 (2d Cir. 2008) (see Pltf. Opp. (Dkt. No. 58) at 29), plaintiffs "assisted [d]efendant . . . in . . . locati[ng] and recover[ing] . . . the S.S. Central America, a United States Mail steamship that sank off the coast of South Carolina in 1857."  Williamson, 542 F.3d at 47.  The contracts at issue were

> non-compete agreements, whereby the hired workers promised not to work on the waters off the shore of the Carolinas in exchange for a portion of the proceeds from a potential recovery effort of a shipwreck in the ocean; non-disclosure agreements, whereby the hired workers promised not to discuss the work they were doing on a ship in the Atlantic Ocean; and the lease of equipment for use in the search for the S.S. Central America in the Atlantic Ocean.

Id. at 49.

The Second Circuit found that, "[w]hile the [d]efendants may be correct in stating that these are just standard non-compete, nondisclosure, and lease contract agreements, they are incorrect in arguing that the contracts are therefore not maritime contracts."  Id.  Rather, the court concluded that "the nature and character of these non-compete and non-disclosure agreements, as well as the agreement to provide technical equipment in exchange for a

percentage of the recovery, are clearly 'salty,'" and that "the contracts at issue . . . 'were by their terms entered into in connection with [a] maritime commercial venture and are therefore maritime in nature.'"  Id. (quoting Kirby, 543 U.S. at 22; Williamson v. Recovery Ltd. P'ship, No. 06 Civ. 5724 (LTS) (FM), 2007 WL 102089, at *2 (S.D.N.Y. Jan. 16, 2007), aff'd, 542 F.3d 43 (2d Cir. 2008)).

Here, by contrast, the "nature and character" of the Investment Management Agreement is not maritime commerce.  While the contracts in Williamson were "entered into in connection with [a] maritime commercial venture" – the location and recovery of a shipwreck in exchange for proceeds from that recovery – the Investment Management Agreement was entered into to "provide investment management services with respect to ship finance transactions, loans or leases."  (Agreement (Dkt. No. 59-3) at 2)  Although the Investment Management Agreement references loans that will be used by third party borrowers to purchase ships for recycling purposes, that fact does not convert what is the provision of investment management services into a contract for the provision of maritime services.  See Kirby, 543 U.S. at 24.  Similarly, Four Wood Capital Advisors' obligation to "source prospective transactions from qualified owners/operators of middle market shipping companies for [YieldStreet Marine Finance and its affiliated special purpose entities]," and YieldStreet Marine Finance's obligation "to retain and direct a maritime law firm . . . to draft and perfect mortgage contracts and related documentation for such transactions" (Agreement (Dkt. No. 59-3) at 2), do not render the Investment Management Agreement a maritime contract.

Plaintiffs also argue that "the Agreement was between marine-focused entities – [YieldStreet Marine Finance] and [Four Wood Capital Advisors], explicitly defined to include [Four Wood Capital Advisors'] affiliate 'Maritime Finance Advisors' – and emblazoned with the

logo of another affiliate, Global Marine [Transport Capital], on every page, further indicating the Agreement's 'principal objective' is 'maritime service [and] maritime transactions.'"  (Pltf. Opp. (Dkt. No. 58) at 27 (fifth alteration in original) (emphasis omitted))  In support of this argument, Plaintiffs cites to <u>d'Amico Dry Ltd. v. Primera Mar. (Hellas) Ltd.</u>, 886 F.3d 216 (2d Cir. 2018).

In <u>d'Amico Dry Ltd.</u>, the plaintiff was a shipping company, and the defendant – Primera – was a ship management company.  <u>Id.</u> at 217.  "d'Amico sold a derivative financial instrument known as a forward freight agreement ('FFA') to Primera," under which "d'Amico was obligated to pay Primera if the mean market rates for shipping on certain types of vessels on certain routes during certain months exceeded an agreed-upon rate," and "Primera was obligated to pay d'Amico if the market rate was less than the agreed-upon rate."  <u>Id.</u>  When Primera did not make the required payments under the FFA, "d'Amico terminated the FFA."  <u>Id.</u>

In determining whether the FFA was a maritime contract, the Second Circuit noted that the essential facts were that "d'Amico, a shipping company, sold a freight-derivative valued by reference to freight rates.  And[] . . . the fluctuation of those rates was a risk inherent in d'Amico's shipping operations."  <u>Id.</u> at 222.  The Second Circuit concluded, that "[g]iven the alignment between d'Amico's identity and the substance of the agreement, the d'Amico-Primera FFA was plainly made as part of d'Amico's shipping business, and its principal objective is promoting maritime commerce."  <u>Id.</u>  In so concluding, the court found that

> [w]here the identity of at least one party (here, d'Amico's identity as a shipping business) aligns with the substance of the agreement (here, the parties' respective estimations of the market rate for freight on vessels and certain routes integral to at least one party's business), the resulting agreement is distinctly briny.

<u>Id.</u> at 223.

Here, by contrast, no party is a "shipping business," and no party's identity "aligns with the substance of [any] agreement" that is "distinctly briny."  And, for the reasons

discussed above, the substance of the Investment Management Agreement is investment management and not maritime commerce.

Plaintiffs also cite to XL Specialty Ins. Co. v. Prestige Fragrances, Inc., 420 F. Supp. 3d 172 (S.D.N.Y. 2019). "XL Specialty is an insurer that offers marine cargo insurance," and "Prestige is a wholesale distributor of brand name fragrances and cosmetics." Id. at 175. "Although most of Prestige's customers are located in the United States . . . , 50 to 60 percent of the goods it sells are imported, . . . and 99 percent of this merchandise is shipped to Prestige via ocean-going vessels." Id. at 175-76. Prestige obtained insurance policies from XL Specialty in 2014, 2015, and 2016, which were "expressly labeled 'Ocean Marine Cargo' policies [and] provide[d] coverage for goods 'ship[ped] . . . at and from ports and/or places in the world to and at ports and/or places in the world directly or via ports and/or places in any order.'" Id. at 180, 183, 185, 190 (third alteration and omission in original).

This Court "conclude[d] that 'the primary or principal objective of the [2014, 2015, and 2016 insurance policies] is the establishment of policies of marine insurance.'" Id. at 189 (second alteration in original) (quoting Folksamerica Reinsurance Co., 413 F.3d at 315). And in holding that XL Specialty's insurance policies were maritime in nature, this Court noted that "[i]n the insurance context, 'admiralty jurisdiction will exist over an insurance contract where the primary or principal objective of the contract is the establishment of policies of marine insurance.'" Id. (quoting Folksamerica Reinsurance Co., 413 F.3d at 315). This Court further noted that "the 'nature of the business insured' – a company that imports more than half of its inventory from overseas, nearly all of which is shipped to the United States via ocean-going vessels . . . – supports the conclusion that the 'principal objective of [the] contract[s] [at issue] is

maritime commerce.'"  Id. (alterations in original) (omission added) (quoting Folksamerica

Reinsurance Co., 413 F.3d at 325).

        Here, the Investment Management Agreement is not a marine cargo insurance

policy regarding the ocean transport of goods, and no party ships inventory overseas via ocean-

going vessels.  Although the use of maritime terminology may in some cases support a

conclusion that a contract is maritime, see id. at 190, here the references to "marine" and

"maritime" do not convert what is an investment management agreement into a maritime

contract.

        Plaintiffs further argue that, in Kirby, the Supreme Court emphasizes that, "'[t]o

ascertain whether a contract is a maritime one, [courts] cannot [merely] look to whether a ship or

other vessel was involved in the dispute.'"  (Pltf. Opp. (Dkt. No. 58) at 28 (first alteration in

original) (quoting Kirby, 543 U.S. at 23))  Here, of course, the Investment Management

Agreement references vessels, in that vessels are the investments and collateral underlying the

loans that are the subject of the Agreement.  (See Agreement (Dkt. No. 59-3) at 2))  The

Agreement does not involve the operation of vessels, however, but merely requires the

monitoring of vessels as investments.  (See id.)  And although Plaintiffs cite cases in which

maritime jurisdiction was found even where the contracts at issue did not involve vessel

operation (see Pltf. Opp. (Dkt. No. 58) at 28-29), each of those contracts involved maritime

transactions or services within the meaning of Kirby.  See Folksamerica Reinsurance Co., 413

F.3d at 315 (concluding that "the insurance contract at issue is primarily or principally concerned

with maritime objectives, although there were incidental non-maritime elements"); d'Amico Dry

Ltd., 886 F.3d at 224 (concluding that "as a component of [plaintiff]'s shipping business, the

[forward freight agreement]'s principal objective was facilitating maritime commerce");

Williamson, 542 F.3d at 49 (quoting Williamson, 2007 WL 102089, at *2) (concluding that "the contracts at issue here 'were by their terms entered into in connection with [a] maritime commercial venture and are therefore maritime in nature'").  As discussed above, the Investment Management Agreement involves investment management services – not maritime transactions, services, or commerce.  Accordingly, while this Court acknowledges that some contracts that do not involve vessel operation may be maritime, the Investment Management Agreement at issue here is not one of them.

"[T]he 'fundamental interest giving rise to maritime jurisdiction is the "protection of maritime commerce,"'" Kirby, 543 U.S. at 25 (emphasis in original) (quoting Exxon Corp., 500 U.S. at 608; Sisson, 497 U.S. at 367), and Plaintiffs have not demonstrated that the Investment Management Agreement is aimed at maritime commerce.  It is instead aimed at investment management.  As a result, this Court lacks subject matter jurisdiction.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is granted.  Defendants' request for oral argument is denied as moot.  The Clerk of Court is directed to terminate the motion (Dkt. No. 54), and to close this case.

Dated: New York, New York
       March 30, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge